# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SYLVALENE D. BURKE,       )
                                 )
      Plaintiff,           )
                                 )
   vs.                    )    Case number 4:10cv0858 TCM
                                 )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
                               )
      Defendant.      )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Sylvalene Burke's application for supplemental security income benefits (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the Court for a final disposition.[1] Ms. Burke has filed opening and reply briefs in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Sylvalene Burke (Plaintiff) applied for SSI in August 2006, alleging a disability since August 1, 2000, caused by knee problems and an enlarged bile duct.  (R.[2] at 81-86.[3])  Her

---

[1]See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

[3]The application she filed reads that it is for disability insurance benefits under Title II of the Act.  In this case, this error is of form only as the analysis is the same under either Title.

application was denied initially and following a hearing held in August 2008 before Administrative Law Judge (ALJ) Michael D. Mance.  (Id. at 6-48, 53-58.)  The Appeals Council denied her request for review, effectively adopting the decision of the ALJ as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Vincent Stock, M.A., a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then 45 years old and lives with her husband and son. (Id. at 22, 28.)  She finished the twelfth grade, but had always been in special education classes.  (Id. at 22.)  She can read and write at a "simple level" and do very minimal math. (Id. at 22, 38.)  She had trained and been certified as a dentist's assistant and also as a nurse's aide.  (Id. at 22.)  The latter certification is no longer current.  (Id. at 39.)

Plaintiff last worked in 1992.  (Id. at 23.)  She stopped working to take care of her husband and is still doing so.  (Id.)  She does this by making sure he takes his medication. (Id. at 39.)  Otherwise, he is able to take care of himself.  (Id.)

She listed an August 2000 date as her disability onset date because that was when she had the knee surgeries.  (Id. at 23-24.)

Plaintiff testified that she is unable to work because her knee problems make it hard for her to walk.  (Id. at 24.)  She has arthritis in both knees.  (Id.)  When she grocery shops, she has to lean on the cart.  (Id. at 29.)  She can not walk or stand for longer than twenty-five minutes.  (Id.)  She wears a brace on both knees; she has worn one on the left knee

occasionally for the past year.  (Id. at 33, 35.)  She has had two surgeries on her right knee.  (Id. at 24, 33.)  Three or four months ago, she was told by an emergency room doctor that she needed another surgery or a knee replacement.  (Id. at 34.)  Several years ago, she was told she might need to have replacement surgery on the left knee.  (Id.)  She rated the pain in her right knee as a seven on a ten-point scale with ten being "hospitalizing pain" and as a five in her left knee.  (Id. at 35.)

Also, she has to have surgery on her enlarged bile duct.  (Id. at 26.)  If she had Medicaid, she would have the surgery.  (Id. at 35.)  She is in constant pain, which she rates as averaging between seven and eight.  (Id. at 26, 27, 30, 36.)  When sitting, she has to rock back and forth because of the pain.  (Id. at 29.)  She takes Tylenol every four hours for the pain.  (Id. at 27.)  At night, she takes Percocet to help her sleep.  (Id.)  The Percocet makes her drowsy if she takes it during the day.  (Id. at 30.)  She also takes Protonix for her acid reflux disease, which she has had for several years, and an anti-nausea medication for her bile duct problems.  (Id. at 31.)  Because of the acid reflux disease, she might vomit five or six times during a thirty-day period depending on what she eats.  (Id. at 37.)  She gets migraines once a month.  (Id. at 31.)  Her doctors have told her to take Tylenol for the migraines and go to bed in a dark room.  (Id. at 31-32.)  The migraines last a day or a day and a half.  (Id. at 32.)  She has high blood pressure that makes her dizzy and lightheaded when it goes up.  (Id. at 37.)  She does not take any medication for it; her doctors have told her to watch it.  (Id.)

Plaintiff does not see her doctor as often she would like because it is hard for her to make the necessary payment. (Id.) Her doctor, Dr. Northern, has been her doctor since her son was born in 1988. (Id. at 32.) She does not have any medical benefits, and has been denied Medicaid. (Id. at 32-33, 35.) She will sometimes go to the free community care clinic. (Id. at 33.) The clinic does not have all the medical services she needs. (Id.)

Plaintiff does not have any problems taking care of her personal needs. (Id. at 28.) She microwaves meals and cleans the house once a month. (Id.) Her son does the laundry. (Id.) She spends most of her day laying down or sitting in a recliner and watching television. (Id. at 30.) She does not go to church or belong to any organizations. (Id.)

Mr. Stock testified as VE. In answer to his inquiries, Plaintiff testified that she had worked as a cashier at McDonald's for two years until 1992. (Id. at 42-43.) She sat on a stool when performing this job and left it when her husband applied for disability. (Id.)

The ALJ then asked the VE about a hypothetical claimant who was Plaintiff's age and with her education and no past relevant work. (Id. at 44.) This claimant could perform light[4] exertional level work with nonexertional limitations of only occasionally climbing stairs or ramps; stooping, kneeling, crouching, crawling, and pushing and pulling with her lower extremities. (Id.) She should never climb ropes, scaffolds, or ladders and should avoid concentrated exposure to unprotected heights and hazardous machinery. (Id.) The VE replied that such a claimant could work as a housekeeper or cashier. (Id. at 44-45.)

---

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

Both jobs were at the light, unskilled level and existed in significant numbers in the state and national economies.  (Id.)

The ALJ modified the hypothetical by restricting the claimant to sedentary work[5] with the same nonexertional limitations as in the first hypothetical.  (Id. at 45.)  This claimant would be able to perform the job of cashier and of an assembly line fabricator. (Id.)

If this hypothetical claimant required a job that allowed for occasional unscheduled disruptions during the workday or workweek, there were no jobs that she could perform. (Id. at 45-46.)  If a claimant had all the limitations described by Dr. Northern in his assessment of Plaintiff, she would "have a significant difficulty working and maintaining a job."  (Id. at 46-47.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and an assessment of her physical residual functional capacity.

When applying for SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 11 inches and her weight as 212 pounds.  (Id. at 97-105.)  Her ability to work is limited by knee problems and an enlarged bowel duct.  (Id. at 98.)  These impairments

---

[5]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

prevent her from sitting too long and require that she frequently lie down.  (Id.)  They first bothered her in August 2005 and prevented her from working in August 2000.[6]  (Id.)  She stopped working on February 1, 1992, because her husband was approved for disability and she stayed home to care for him.  (Id.)  Her medications include Allegra for sinus problems, codeine for pain, and Tagamet for her stomach problems.  (Id. at 103.)  She completed the twelfth grade and did not attend special education classes.  (Id. at 104.)

Plaintiff also completed a Function Report.  (Id. at 115-22.)  When home, she sits or lies down.  (Id. at 115.)  She takes her husband to the post office or to a doctor's appointment.  (Id.)  She does not have any problems taking care of her personal needs or need any reminders to do so.  (Id. at 116-17.)  She usually prepares her meals once a day. (Id. at 117.)  She sometimes does laundry, but it takes her half a day.  (Id.)  It is hard for her to do house or yard work.  (Id. at 118.)  She shops once a month for half a day.  (Id.)  Her hobby is watching television.  (Id. at 119.)  She cannot play with her granddaughter or work in her flower bed without getting sick.  (Id.)  She does not have any problems getting along with other people.  (Id. at 120.)  She is in constant pain.  (Id.)  Her impairments affect her abilities to lift, squat, bend, stand, walk, sit, kneel, and climb stairs.  (Id.)  It hurts her to lift ten pounds or to walk farther than thirty to forty feet.  (Id.)  She finishes what she starts and can follow written instructions.  (Id.) She wears contact lenses or glasses; she does not use crutches, a cane, or braces.  (Id. at 121.)

---

[6]This seeming discrepancy is not explained.

Also when applying for SSI, Plaintiff informed the interviewer that her enlarged bile duct could become cancerous within three months if she did not have surgery. (Id. at 108.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application. (Id. at 137-41.) She did not have any new limitations, illnesses, injuries, or conditions since last completing the disability report, in August 2006, nor had her condition worsened. (Id.)

On an updated list of medications submitted at the hearing, Plaintiff listed Protonix for her acid reflux disease, Naproxen for her pain, and Promethazine for her nausea. (Id. at 143.) The first was prescribed by Dr. Ranney; the second by Dr. Northern; and the third by Dr. Johnston. (Id.) She also takes over-the-counter extra-strength Tylenol. (Id.)

An earnings report generated pursuant to Plaintiff's application lists annual earnings for eleven of the sixteen years included. (Id. at 86.) Beginning with the ninth year, 1985, Plaintiff had earnings every year up to and including the last year listed, 1992. (Id.) Her highest earnings were $7,914.60, in 1989. (Id.) Her earnings exceeded $3500 in only one other year, 1990. (Id.) In 1985, 1991, and 1992, her earnings were less than $500.00. (Id.)

The medical records before the ALJ are summarized below in chronological order.

Plaintiff consulted the health care providers at the Community Care Clinic (CCC) in July 2005 about shooting pains in her neck. (Id. at 216.) On December 1, she returned for evaluation of a painful knot on her right foot and a refill of her medication. (Id. at 215.) Four weeks later, on December 29, she complained of intermittent pain in her right side for the past two weeks that would last two hours at a time and would subside with Ibuprofen.

- 7 -

(Id. at 214.)  She also stated that she had had daily menses (menstrual periods) since 1988 but had no history of anemia.  (Id.)  She was prescribed medication for the pain and was to return as needed.  (Id.)  Her menstrual cycles were to be discussed with another physician. (Id.)

Plaintiff was admitted to the Phelps County Regional Medical Center (Phelps) on February 5, 2006, after a four-day period of nausea, vomiting, and abdominal pain.  (Id. at 153-80.)  Allen Northern, D.O., was listed as the attending physician.  (Id. at 153.)  She reported having had similar symptoms approximately three years earlier that had resolved after thirty-six hours.  (Id. at 155.)  She had been told by a surgeon in St. Louis that she has a dilated common bile duct.  (Id.)  A chest x-ray was normal.  (Id. at 163.)  An x-ray of her abdomen was "negative for obstruction or free air" and revealed some calcification overlying her right iliac wing.  (Id. at 164.)  This was thought to "most likely represent[] a small bone island in the ileum."  (Id.)  A computed tomography (CT) scan of her abdomen and pelvis was negative for urolithiasis and revealed a dilated common bile duct.  (Id. at 165.)  After being able to tolerate a bland diet and having no further vomiting, although continuing to have some nausea and pain that was a four on a ten-point scale, Plaintiff was discharged on February 9 with instructions to see a Dr. Akins on February 22.  (Id. at 153.) The discharge diagnosis was persistent nausea and vomiting, dehydration, and a choledochal[7] cyst.  (Id.)

---

[7]Choledochal is defined as "[r]elating to the common bile duct."  Stedman's Medical Dictionary, 328 (26th ed. 1995).

Plaintiff was seen by J. Christopher Eagon, M.D., on February 23 for evaluation of her Type 1 choledochal cyst.  (Id. at 207-08.)  He recommended that she have a choledochal cyst excision with Roux-en-Y hepaticojejunostomy[8] and a endoscopic retrograde choledochopancreatography (ERCP) to determine if the cyst has changed in size.  (Id. at 208.)  The following month, an ERCP revealed a fusiform "marked[]" dilation of the common duct.  (Id. at 209-12.)

Dr. Eagon noted in May that Plaintiff had still NOT obtained Medicaid coverage to have the surgery.  (Id. at 208.)  She was to contact him when she did.  (Id.)

Plaintiff consulted the health care providers at CCC in June about earaches, coughing, and a sore throat.  (Id. at 213.)

Plaintiff was seen by Richard Keith Johnson, M.D., on October 31 for her abdominal pain.  (Id. at 182-85.)  It was noted that the surgery suggested in February was "elective, non-emergent" and could not be justified when Plaintiff had no insurance.  (Id. at 184.)  On examination, she was tender in the right upper quadrant with palpation and once vomited "a clear, slightly bile-tinged material."  (Id.)  She had a full range of motion in all four extremities.  (Id.)  The diagnosis was "a choledochal cyst extending at least up to the bifurcation of the intrahepatic biliary ducts."  (Id.)  Surgical intervention was recommended. (Id.)

---

[8]A Roux-en-Y hepaticojejunostomy is a common surgical technique for biliary reconstruction.  Duct-to-duct vs. Roux-en-Y Hepaticojejunostomy for Biliary Reconstruction, http://clinicaltrials.gov/ct2/show/NCT00646685 (last visited Aug. 31, 2011).

Notes from the CCC dated August 16, 2007, are from an office visit for treatment of pain on her right side, acid reflux, and nausea. (Id. at 187-89, 204-05.) Plaintiff reported that she had had good results with one medication but could no longer afford it. (Id. at 187.) Rolaids and Tagamet gave her some relief. (Id.) She was prescribed Protonix. (Id.) This prescription was renewed in September and November. (Id.)

Plaintiff went to the Phelps emergency room on November 18 complaining that sharp pain in her right knee was causing it to give out. (Id. at 192-203.) She was described as alert and in no acute distress. (Id. at 192.) She had a normal range of motion in the knee and mild swelling. (Id.) She was diagnosed with a strained knee and discharged home with instructions to use her crutches and knee immobilizer and to follow-up in four to five days. (Id. at 193, 203.)

The ALJ also had before him a November 2006 assessment by Dr. Northern of Plaintiff's physical residual functional capacity. (Id. at 218-22.) Dr. Northern concluded that Plaintiff could sit for three hours in an eight-hour workday, stand for one, walk for one, and work for two. (Id.) These limitations were caused by heel and knee pain with weight bearing. (Id.) She could lift up to ten pounds frequently and fifty pounds or less occasionally. (Id.) She could carry twenty pounds or less frequently and should never carry more than that. (Id.) She could use both hands for repetitive actions, but could not use either foot for such actions due to her knee pain. (Id. at 219.) She could occasionally bend, squat, climb, stoop, and crouch but could not crawl or kneel. (Id. at 220.) She could occasionally tolerate exposure to unprotected heights but needed to avoid other

environmental hazards, e.g., being around moving machinery or being exposed to dust, fumes, gases, and noise.  (Id.)  Her pain was daily and moderate, i.e., it "could be tolerated but would cause marked handicap in the performance of the activity precipitating pain," and was caused by a degenerative joint disease in her knee.  (Id. at 220-21.)  Because of this pain, she had a reduced range of motion.  (Id.)  She did not have any limitations in her mental or social activities.  (Id. at 221-22.)  She had been prescribed Vicodin for the pain. (Id. at 222.)

Also before the ALJ was a notation on a September 2006 request to Dr. Northern for copies of Plaintiff's records that he had last seen her on September 17, 2003.  (Id. at 109-14.)

## The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation process, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since filing her application.  (Id. at 10-11.)  The ALJ next found that Plaintiff had severe impairments of a choledochal cyst with dilated common bile duct and probable arthritis of the right knee.  (Id. at 11.)  She did not, however, have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that she had the RFC to perform the full range of light work.  (Id.)  In reaching this determination, the ALJ considered the credibility of Plaintiff's statements.  (Id. at 12-14.) He compared those statements with the objective evidence and noted several discrepancies

- 11 -

in the record.  For instance, she alleged disability since August 2000 but did not file until six years later.  (Id. at 14.)  She quit work in 1992 to take care of her husband when he was awarded disability and not for reasons related to her alleged impairments.  (Id.)  There are no medical records prior to February 2006.  (Id.)  One year of SSI benefits would be competitive with her wages, the record of which did not support the proposition that she would be working but for her impairments.  (Id.)  She testified she had been in special education classes throughout school; however, when applying for SSI, she reported that she had not been.  (Id.)  She testified she had a learning disability, but completed the training necessary to be certified as a nurse's aide.  (Id.)  Nor had she ever been observed to be in acute distress by any examining physician.  (Id.)

Additionally, Dr. Northern's assessment of Plaintiff's RFC was entitled to little weight because he had not seen Plaintiff since February 2006, when he had apparently seen her when hospitalized at Phelps.  (Id.)  Before that, he had not seen her since September 2003.  (Id.)  He reported that she had degenerative joint disease, but did not note such a diagnosis when seeing her in the hospital and did not support it with any imaging reports. (Id.)

Given her age, education, work experience and RFC for light work, application of the Medical-Vocational Guidelines directed a finding of not disabled.  (Id. at 15.) Alternatively, giving Plaintiff the benefit of the doubt and limiting her to 650f2d139 light exertional work requiring (a) no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; (b) no climbing of ropes, ladders,

or scaffolds; and (c) no concentrated exposure to unprotected heights and industrial hazards, she could, according to the VE's testimony, work as a housekeeper or cashier.  (Id.)  Such jobs existed in substantial numbers in the national, state, and local economies.  (Id.)  Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 16.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 416.920(c).  The Act defines "severe impairment" as "any impairment or

combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523.  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's

decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v.</u> <u>Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  When evaluating a claimant's credibility, the ALJ must consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Moore</u>, 572 F.3d at 524).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005)).  After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant

work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 416.920(f).  The Commissioner may meet this burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).  Or, "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."  **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547

F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001).   "'Substantial evidence is less than a preponderance but is enough that a reasonable

mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting

<u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)).   When reviewing the record

to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision.   **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d

1047, 1050 (8th Cir. 1999).   The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037,

or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.   Thus, if "it is

possible to draw two inconsistent positions from the evidence and one of those positions

represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler**

**v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).   <u>See also</u> **Owen v. Astrue**, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's

decision falls within the available zone of choice") (internal quotations omitted).

### <u>Discussion</u>

Plaintiff argues that the ALJ (1) erred by denying her claim based on work

opportunities that are "merely conceivable and not reasonably possible"; (2) not giving the

assessment of her treating physician, Dr. Northern, the appropriate weight; and (3)

improperly assessing her credibility, including by requiring that she "be bedridden or

- 17 -

completely helpless" to be disabled and by considering only the lack of supporting objective evidence.  (Pl. Br. at 8-12.)  The Commissioner disagrees.

Citing **Barker v. Harris**, 650 F.2d 138 (8th Cir. 1981) (per curiam), Plaintiff first argues that the ALJ erred by finding she could work as a housekeeper or cashier because such work was "merely conceivable" and "not reasonably possible" given her limitations and health problems.  In **Barker**, the Eighth Circuit Court of Appeals held that the district court correctly summarized the standard of review of an ALJ's decision to deny benefits, including a requirement that "the emphasis [be] on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable . . . ."  **Id.** at 139.

To the extent that this argument implies a requirement that Plaintiff be hired if she found and applied for either the position of housekeeper or cashier, it is unavailing. "[S]tatutory definitions and social security regulations provide that disability is to be evaluated in terms of a claimant's ability to perform jobs rather than on his or her ability to obtain them."  **Kerns v. Apfel**, 160 F.3d 464, 468 (8th Cir. 1998).  See 42 U.S.C. § 423(d)(2)(A) (requiring that a determination of disability is to be made "regardless of whether such work exists in the immediate area in which [the individual] lives, or whether a specific job vacancy exits for [her], or whether [s]he would be hired if [s]he applied for work"); 20 C.F.R. § 416.966(c) (requiring that a finding of not disabled be made if a claimant remain unemployed because, inter alia, of an inability to get work, lack of work in her local area, an employer's hiring practices, not being actually hired to do work she could otherwise do, and not wanting to do a particular type of work).  See also **Barker**, 650 F.2d

at 139-40 ("[I]t is not the duty or burden of the [Commissioner] to find a specific employer and job for the claimant but, instead some effort and some ingenuity within the range of the claimant's capacity remains for [her] to exercise.").

Insofar as this argument challenges the ALJ's RFC findings, it is also without merit.

As noted above, when determining a claimant's RFC, the ALJ must evaluate her credibility. And, when evaluating a claimant's subjective complaints, an ALJ may properly consider whether those complaints are supported by the objective medical evidence, although a lack of such support may not be the only reason for discounting her complaints. **Halverson v. Astrue**, 600 F.3d 922, 931-32 (8th Cir. 2010). The objective medical evidence does not support Plaintiff's claims of disabling knee problems and an enlarged bile duct since August 2000. The first reference in the medical records to her seeking treatment for either is in December 2005 when she complained of intermittent pain in her right side. Two months later, she was hospitalized for four days after experiencing a four-day period of nausea, vomiting, and abdominal pain. The discharge diagnosis was persistent nausea and vomiting, dehydration, and a choledochal cyst. Surgery was recommended but considered "elective [and] non-emergent." She was seen again for abdominal pain in October 2006. She had a full range of motion in all her extremities. Ten months later, she went to the clinic with complaints of right side pain, acid reflux, and nausea. She reported that she had had relief with one medication, but could no longer afford it. She was prescribed medication and was able to renew the prescriptions at least twice. The first reference to Plaintiff seeking medical attention for her knees is in November 2007. She complained then of right knee pain, but

had a normal range of motion in the knee and only mild swelling.  The diagnosis was a strained knee.

Contrary to Plaintiff's argument, the ALJ did not consider only the lack of supporting objective medical evidence when evaluating her credibility.  He also properly considered the fact that Plaintiff stopped work when her husband successfully applied for disability and not because of any impairment.  See **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009); **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Goff**, 421 F.3d at 793.  And, her alleged date of onset was unrelated to any precipitating and aggravating factors.  See **Wildman v. Astrue**, 596 F.3d 959, 968 (8th Cir. 2010) (considering such factors as relevant to a claimant's credibility).  Additionally, the ALJ correctly considered Plaintiff's poor work record as detracting from her credibility.  A *consistent* work record supports a claimant's credibility, see **Hutsell v. Massanari**, 259 F.3d 707, 713 (8th Cir. 2001); conversely, an inconsistent work history does not, see **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004); **Ramirez**, 292 F.3d at 581.  See also **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (affirming ALJ's adverse credibility decision based in part on claimant's poor work history, including an absence of earnings at a level indicating substantial gainful activity even when not allegedly disabled); **Pearsall**, 274 F.3d at 1218 ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability.").  Another consideration properly found to be detracting from Plaintiff's credibility was "the fact that her prospective SSI benefits would exceed the amount she was able to earn while working . . . ."  **Ramirez**, 292 F.3d at 581.

- 20 -

Plaintiff correctly notes that a claimant "'need not be bedridden in order to be unable to work' . . . ." **Wagner**, 499 F.3d at 851 (quoting <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1025 (8th Cir. 2007)).  In the instant case, however, the ALJ did not require that she be.  As discussed above, the ALJ considered other, proper factors when weighing Plaintiff's credibility.  "Where adequately explained and supported, credibility findings are for the ALJ to make." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000).  The ALJ having explicitly discredited Plaintiff's testimony and having "give[n] good reasons for doing so," see **Jones v. Astrue**, 619 F.3d 963, 975 (8th Cir. 2010) (internal quotations omitted), the Court will defer to that determination.

Plaintiff also argues that the ALJ erred by not giving Dr. Northern's assessment great weight.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); <u>accord</u> **Halverson**, 600 F.3d at 929; **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other

- 21 -

substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

Title 20 C.F.R. § 416.927(d) lists six factors to be evaluated when weighing opinions of treating physicians:  (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record."  20 C.F.R. § 416.927(d)(1)-(6).  Consideration of these factors militates against giving Dr. Northern's assessment controlling weight.  First, although Plaintiff referred to him as her treating physician since 1988, the only reference to him in the medical records other than his assessment was to him being the attending physician when she was hospitalized in 2006 for nausea, vomiting, and abdominal pain.  The assessment itself, issued nine months later, does not refer to this hospitalization but only to him having last seen her in September 2003.  Those records were not before the ALJ.[9]

---

[9]Plaintiff argues in her reply brief that the ALJ should have recontacted Dr. Northern if he found Dr. Northern's records insufficient.  As noted above, it was the claimant's duty to prove her RFC.  See **Moore**, 572 F.3d at 523.  "The ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).  A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff.  See e.g. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

Second, Dr. Northern's assessment is not supported by, or consistent with, the medical records and was clearly based on Plaintiff's subjective complaints. It is permissible for an ALJ to discount an assessment of a treating physician that consists of conclusory statements, as did Dr. Northern's. See **Wildman**, 596 F.3d at 964. See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Third, there is no indication in the record of any specialization of Dr. Northern; rather, Plaintiff testified that he had been her treating physician since her son was born in 1988.

Plaintiff also takes issue with the ALJ's finding that her surgery was "elective and non-emergent." (See Pl. Br. at 10.) This was the finding of Dr. Johnson.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted); accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  6th  day of September, 2011.